# EXHIBIT 2

L. Timothy Fisher (SBN 191626)
Jenna L. Gavenman (SBN 348510)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
E-mail: jgavenman@bursor.com

Christian Levis (admitted *pro hac vice*)
Amanda Fiorilla (admitted *pro hac vice*)
Rachel Kesten (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

*Additional Counsel for Plaintiffs on
Signature Page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, JANE DOE II, JOHN DOE, E.C., JOSE MARQUEZ, and HOLLIS WILSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GOODRX HOLDINGS, INC., CRITEO CORP., META PLATFORMS, INC., AND GOOGLE LLC.<br><br>        Defendants. | Case No.: 3:23-cv-00501-AMO<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jane Doe, Jane Doe II, John Doe, E.C., Jose Marquez, and Hollis Wilson (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendants GoodRx Holdings, Inc. ("GoodRx"), Criteo Corp. ("Criteo"), Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Meta"), and Google, LLC ("Google") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1.      Founded in 2011, GoodRx is a combination telehealth and prescription coupon

company. GoodRx claims that its mission is to "build better ways for people to find the right care at the best price." In 2021, GoodRx brought in more than $745 million in revenue.

2. GoodRx's services are available through both the GoodRx website available at www.goodrx.com and the GoodRx mobile application (the "GoodRx Platform"). The GoodRx mobile application is advertised as the "#1 most downloaded medical app on the iTunes [Apple] and Google Play app stores." Approximately 20 million people use GoodRx's services each month.

3. GoodRx allows consumers to save money on prescription drugs by gathering current prices and discounts, as well as by offering prescription coupons. To access prescription discounts, a user enters the medication name and then selects a local pharmacy. They can also text, email, or print a copy of a "GoodRx Coupon" to present at the pharmacy when picking up their prescription. When the prescription is purchased using a GoodRx Coupon, GoodRx obtains a record of this purchase that includes the user's name, date of birth, and prescription information.

4. Users can sign up for an account with GoodRx by providing their first and last name, email address, and date of birth. They can also obtain a "GoodRx Prescription Savings Card" to obtain "discounts of up to 80% on most prescription drugs at over 70,000 U.S. pharmacies." To receive this card users are required to provide their first and last name, address, and email.

5. GoodRx also offers telehealth services under the brand "HeyDoctor" and "GoodRx Care." To access these services a user is prompted to provide their personally identifiable information ("PII"), including their first and last name, email address, phone number, biological sex, and current address. The user must then select the type of treatment they are seeking, such as urinary tract infection, erectile dysfunction, anxiety, depression, acne treatment, birth control, or short-term medication refills. Depending on the treatment or the prescription sought, a user is required to either complete an online consultation and enter information about their symptoms and medication history or schedule a visit with a provider. They must also provide payment information.

6. Additionally, GoodRx offers "GoodRx Gold" which is a monthly "healthcare membership." Using this membership, GoodRx claims users can access over 1,000 prescriptions at

less than $10 and arrange visits with "licensed healthcare provider[s]" at just $19. GoodRx Gold users can also use this service to track their medication purchase history, including the medication name, purchase date, dosage, pharmacy, and prescriber.

7.      Lastly, GoodRx operates under the brand "GoodRx Health," which allows users to access a number of informational resources about health conditions and treatments. For instance, users can select "How to Get Rid of a Urinary Tract Infection (UTI) Fast" written by Alice Perlowski, MD, MA, FACC.

8.      GoodRx has long claimed that it values users' privacy and that it does not disclose or share the information it collects, including health information entered through the GoodRx Platform.

9.      For instance, on December 14, 2019, GoodRx's co-CEO Doug Hirsch tweeted "People can use GoodRx without giving us any information. Any information we do receive is stored under the *same guidelines as any health entity*."

10.     Health entities are regulated under the Health Insurance Portability and Accountability Act ("HIPAA"), which restricts the use of personal health information and electronic personal health information. Among other things, it requires the user's authorized consent in writing before an entity can share this information with third parties. GoodRx's HeyDoctor homepage displayed a HIPAA seal, purportedly repeating these sentiments that it complied with HIPAA.

11.     Hirsch further explained in another tweet that same day "I think it's important to mention that we started GoodRx to help Americans, *not gather data or exploit anyone*" and in another that GoodRx "spend[s] tons of time, energy and resources to protect the limited data we do have. You're right to be focused on this . . . and so are we."

12.     GoodRx's own policies repeat the same promises about safeguarding users' data. Between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any *information that reveals a personal health condition or personal health information*."

3

13.     Between October 2017 and December 2019, GoodRx promised that it would only use "personal medical data" such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx coupons.

14.     Between October 2017 and October 2019, it promised that when this information was shared in this limited capacity, it "ensures that these third parties are bound to comply with federal standards as to how to treat 'medical data' that is linked with your name, contact information and other personal identifiers."

15.     And in March of 2019, GoodRx promised that it adheres to the Digital Advertising Alliance principles. These principles state that entities "should not collect and use . . . pharmaceutical prescriptions, or medical records about a specific individual for Online Behavioral Advertising without Consent."

16.     Given the nature of this information shared through the GoodRx Platform and GoodRx's representations, Plaintiffs and Class members believed their personal information, including health information relating to their medical conditions, symptoms, and prescriptions, would not be shared or disclosed.

17.     Unbeknownst to Plaintiffs and Class members, this sensitive personal information communicated through the GoodRx Platform, including health information relating to medical treatments and prescriptions, was disclosed to and intercepted by some of the largest advertising and social media companies in the country, including Google, Meta, and Criteo ("Advertising and Analytics Defendants").  As discussed below, it was not until earlier this year, when the FTC announced that it had reached a $1.5 million settlement with GoodRx for substantially similar conduct, that the full nature of Defendants' data sharing scheme was brought to light.

18.     Through Advertising and Analytics, Defendants' tracking technology incorporated on the GoodRx Platform, including software development kits ("SDK") and tracking pixels, Defendants Google, Meta, and Criteo knowingly and intentionally intercepted Plaintiffs' and Class members' personal information, including health information relating to their medical conditions,

CONSOLIDATED CLASS ACTION COMPLAINT

symptoms, and prescriptions, communicated through the GoodRx Platform.

19.     This information was not aggregated or deidentified nor were the Advertising and Analytics Defendants prohibited from using this information for their own benefit. Defendants Google, Meta, and Criteo used this information for their own purposes, including to allow GoodRx to advertise on their platforms using GoodRx users' health data.

20.     Each of the Plaintiffs and putative Class members provided their personal information, including health data relating to their medical conditions and medication history, to GoodRx with the expectation that this information would remain confidential and private.

21.     Defendants' interception of this information without consent constitutes an extreme invasion of Plaintiffs' and Class members' privacy. Given the secret and undisclosed nature of Defendants' conduct, additional evidence supporting Plaintiffs' claims, including the full extent of medical information Defendants intercepted, and how they used that information, will be revealed in discovery.

## PARTIES

### A.     Plaintiffs

22.     **Plaintiff Jane Doe** is a resident of Palm Beach County, Florida.

23.     Plaintiff Jane Doe used the GoodRx Platform on multiple occasions during the month of August 2022 to obtain medical treatment and a prescription for a urinary tract infection. Plaintiff Jane Doe accessed GoodRx's platform through the website on her mobile phone.

24.     During the time Plaintiff Jane Doe used the GoodRx Platform, she maintained social media accounts with Facebook and Instagram, and multiple accounts with Google, including Gmail, Google Maps, and YouTube. Plaintiff Jane Doe used the same device to access the GoodRx Platform that she used to access her accounts with Facebook, Instagram, Google Maps, and YouTube.

25.     To obtain treatment and a prescription for a urinary tract infection through GoodRx, Plaintiff Jane Doe was required to enter her name, email address, phone number, biological sex, address, and payment information. She was also required to complete an online consultation, in

which she communicated to GoodRx information about her symptoms and medication history. She paid for these services and received a prescription for an antibiotic through GoodRx.

26.     Unbeknownst to Plaintiff Jane Doe, Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted, this information, including her PII, health data, prescription requests, and other activity by (and about) Plaintiff Jane Doe on the GoodRx Platform.

27.     Plaintiff Jane Doe did not consent to the sharing and interception of her data, or the use of this information by Defendants. Had Plaintiff Jane Doe known GoodRx would share her PII, health information, and other sensitive data with third parties, including for advertising and other undisclosed purposes, she would never have used the website or shared her information with GoodRx.

28.     **Plaintiff Jane Doe II** is a resident of Somerset County, New Jersey.

29.     Plaintiff Jane Doe II used the GoodRx Platform regularly between approximately 2016 and 2023 to obtain prescription coupons. Plaintiff Jane Doe II accessed the GoodRx Platform via the GoodRx mobile application on her phone.

30.     During the last five years Plaintiff Jane Doe II used the GoodRx Platform, she subscribed to, and paid a fee for, GoodRx's "Gold" subscription membership to access additional prescription savings.

31.     During the time Plaintiff Jane Doe II used the GoodRx Platform, she maintained social media accounts with Facebook, and an account with Google, including Gmail. Plaintiff Jane Doe II used the same device to access the GoodRx Platform that she used to access her accounts.

32.     To sign-up for the GoodRx Gold subscription membership plain, Plaintiff Jane Doe II was required to enter her name, email address, birthdate, and payment information. With her account, Plaintiff Jane Doe II was able to use her GoodRx Gold for discounts on her prescription medications.

33.     Unbeknownst to Plaintiff Jane Doe II, Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted this information, including her PII, health data,

prescription information, and other activity by (and about) Plaintiff Jane Doe II on the GoodRx Platform.

34.     Plaintiff Jane Doe II did not consent to the sharing and interception of her data, or the use of this information by Defendants. Had Plaintiff Jane Doe II known GoodRx would share her PII, health information, and other sensitive data with third parties, including for advertising and other undisclosed purposes, she would never have used the website or shared her information with GoodRx.

35.     **Plaintiff John Doe** is a resident of Chicago, Illinois.

36.     Plaintiff John Doe used the GoodRx Platform between 2016 and 2023 to obtain discounts and prescription coupons for a number of prescription medications. Plaintiff John Doe accessed coupons online at GoodRx's website using his mobile phone and public computers.

37.     To obtain discounts and prescription coupons, Plaintiff John Doe was required to enter, at least, his private prescription information.

38.     Unbeknownst to Plaintiff John Doe, Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted, this information, and other activity by (and about) Plaintiff John Doe on the GoodRx Platform.

39.     Plaintiff John Doe did not consent to the sharing and interception of his data, or the use of this information by Defendants. Had Plaintiff John Doe known GoodRx would share his prescription information and other sensitive data with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his information with GoodRx.

40.     **Plaintiff E.C.** is a resident of the State of New York.

41.     Plaintiff E.C. used the GoodRx Platform since at least 2018 in order to locate prescribing pharmacies for various prescriptions of a highly sensitive nature.  Plaintiff E.C. accessed the GoodRx Platform using the web browser on his mobile phone.

42.     During the time Plaintiff E.C. used the GoodRx Platform, Plaintiff E.C. maintained social media accounts with Facebook and Instagram, and has multiple accounts with Google, including a Gmail account.

43.     To identify prescribing pharmacies, Plaintiff E.C. was required to enter, at least, his private prescription information.

44.     Unbeknownst to Plaintiff E.C., Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted, this information, and other activity by (and about) Plaintiff E.C. on the GoodRx Platform.

45.     Plaintiff E.C. did not consent to the sharing and interception of his data, or the use of this information by Defendants. Had Plaintiff E.C. known GoodRx would share his prescription information and other sensitive data with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his information with GoodRx.

46.     **Plaintiff Jose Marquez** is a resident of Salinas, California.

47.     Plaintiff Marquez used the GoodRx Platform between approximately June 2021 and August 2021 to obtain discounts and prescription coupons.

48.     During the time Plaintiff Marquez used the GoodRx Platform, he subscribed to GoodRx's "Gold" subscription membership to access additional prescription savings.

49.     During the time Plaintiff Marquez used the GoodRx Platform, Plaintiff Marquez maintained social media accounts with Facebook and Instagram, and an account with Google, including a Gmail account. Plaintiff Marquez accessed the GoodRx Platform through a mobile application on his Android Samsung Galaxy smartphone.

50.     Plaintiff Marquez used the same device to access the GoodRx Platform that he used to access his accounts with Facebook, Instagram, and Google.

51.     To sign-up for the GoodRx Gold subscription membership plain, Plaintiff Marquez was required to enter his name, email address, and payment information.  With his account, Plaintiff Marquez was able to use his GoodRx Gold for discounts on his prescription medications.

52. Unbeknownst to Plaintiff Marquez, Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted, this information, including his PII, health data, prescription information, and other activity by (and about) Plaintiff Marquez on the GoodRx Platform.

53. Plaintiff Marquez did not consent to the sharing and interception of his data, or the use of this information by Defendants. Had Plaintiff Marquez known GoodRx would share his PII, health information, and other sensitive data with third parties, including for advertising and other undisclosed purposes, he would never have used the website or shared his information with GoodRx.

54. **Plaintiff Hollis Wilson** is a resident of Burlingame, California.

55. Plaintiff Wilson used the GoodRx Platform on multiple occasions between approximately 2015 and 2019 to obtain prescription coupons. Plaintiff Wilson accessed the GoodRx Platform via the GoodRx website on her mobile phone.

56. During the time Plaintiff Wilson used the GoodRx Platform, she maintained social media accounts with Facebook and Instagram, and multiple accounts with Google, including Gmail, Google Maps, and YouTube. Plaintiff Wilson used the same device to access the GoodRx Platform that she used to access her accounts with Facebook, Instagram, Google Maps, and YouTube.

57. To obtain prescription coupons through GoodRx, Plaintiff Wilson signed up for GoodRx's services and was required to enter her name, email address, and phone number.

58. Unbeknownst to Plaintiff Wilson, Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted this information, including her PII, health data, prescription information, and other activity by (and about) Plaintiff Wilson on the GoodRx Platform.

59. Plaintiff Wilson did not consent to the sharing and interception of her data, or the use of this information by Defendants. Had Plaintiff Wilson known GoodRx would share her PII, health information, and other sensitive data with third parties, including for advertising and other undisclosed purposes, she would never have used the website or shared her information with GoodRx.

9

**B.     Defendants**

60.     **Defendant GoodRx Holdings, Inc.** is a Delaware corporation with its principal place of business located in Santa Monica, California.

61.     GoodRx knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the GoodRx Platform without disclosure to its users, including at least SDKs and tracking pixels provided by the Advertising and Analytics Defendants.

62.     The Advertising and Analytics Defendants developed each of these tracking technologies for the express purpose of collecting data from users for, among other things, marketing, analytics, and advertising purposes.

63.     GoodRx knew at the time it incorporated this software into the GoodRx Platform that it would result in the disclosure and interception of users' interactions on the GoodRx Platform, including PII, health information, prescription requests, and other identifiable information, by virtue of how these technologies function and the analytics and insights they received as a result. For example, Meta allows website and app developers, like GoodRx, to use the Meta Pixel and its SDK with access to the data collected from their users and provides them with tools and analytics to leverage that information to reach these individuals through Facebook ads.

64.     Indeed, GoodRx served targeted advertisements to users using the sensitive data disclosed to and intercepted by the Advertising and Analytics Defendants between at least August 2017 and February 2020. Accordingly, it was well aware of the data it disclosed and allowed the Advertising and Analytics Defendants to intercept.

65.     Despite this, GoodRx continued to incorporate the Advertising and Analytics Defendants' technologies into the GoodRx Platform and reap their benefit, including by increasing its overall revenue through advertisements and by improving the GoodRx Platform. As such, GoodRx's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class members.

CONSOLIDATED CLASS ACTION COMPLAINT

66.    **Defendant Meta Platforms, Inc.** is a Delaware corporation with its principal place of business located in Menlo Park, California.

67.    Meta at all times knew that the incorporation of its software into the GoodRx Platform would result in its interception of identifiable health information and other sensitive data.

68.    Meta, as the creator of its SDK and Meta Pixel, knew that it intercepted each of a user's interactions on the website or mobile application that incorporated this technology.

69.    Meta has consistently come under scrutiny for incorporating its technology on websites and applications that involve the transmittal of sensitive data, including health information, yet continues to do so.

70.    For instance, in February 2019, the *Wall Street Journal* published an in-depth analysis of Meta's collection of sensitive health information using its tracking technology from certain mobile applications. These reports led to a subsequent investigation by the Federal Trade Commission, which confirmed that Meta did in fact collect sensitive health information from a popular women's health app, including pregnancy data, between June 2016 and February 2019. It also confirmed that Meta went on to use this information for its own research and development. The New York State Department of Financial Services conducted a similar investigation of Meta and reached a similar conclusion, including finding that Meta did not take sufficient steps or precautions to prevent its interception of this kind of information or its use for commercial purposes.

71.    Further, since at least 2016, Meta has allowed granular ad targeting based on sensitive information collected or received about individuals, including relating to at least breast feeding, ethnicities, religious beliefs, and income levels.

72.    Despite this, it was not until November 9, 2021 that Meta acknowledged its use of data to target users based on "sensitive" topics, including "health" and how that was problematic. While Meta stated that it would remove this functionality in part, it later clarified that the change was limited to individuals' interactions with "content" on the Facebook platform (i.e., the "Detailed Targeting" option on Facebook) and ***did not apply to*** data intercepted through Meta Pixel or SDK

or collected through other means. Thus, third parties were still permitted to use "website custom audiences" and "lookalike" audiences to target users based on the information Meta intercepted through Meta Pixel and its SDK.

73.     Further, Meta has acknowledged its interception of sensitive data, including health information, in public statements highlighting its efforts to develop a "Health Terms Integrity System" intended to filter out this type of information and prevent it from entering Meta's system.

74.     However, independent investigations have confirmed these data filtration systems are not successful at preventing the interception of health data. For instance, researchers at *The Markup* found while investigating the use of Meta Pixel on abortion-related websites that Meta's purported "filtering" system failed to discard even the most obvious forms of sexual health information, including URLs that included the phrases "post-abortion", "i-think-im-pregnant" and "abortion-pill."

75.     Meta's own employees have confirmed the same, admitting that Meta lacks the ability to prevent the collection of sensitive health data or its use in ads. For example, Meta engineers on the ad and business product team wrote in a 2021 privacy overview "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"

76.     As demonstrated by the continued incorporation of Meta's tracking technology on the GoodRx Platform, Meta did not take any steps to prevent its interception and use of GoodRx users' sensitive health data.

77.     As such, Meta's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class members.

78.     **Defendant Google LLC** is a Delaware limited liability company with its principal place of business located in Mountain View, California.

79. Google, as the creator of its SDK and Pixel, and as an established advertising company, knew that it intercepted each of a user's interactions on the website or mobile application that incorporated this technology.

80. Accordingly, Google at all times knew that the incorporation of its software into the GoodRx Platform would result in its interception of sensitive information, including health information relating to medical treatment and prescriptions.

81. Indeed, this is not the first or last time Google has been called out for collecting sensitive data like health information. Indeed, in a February 2019 article from the *Wall Street Journal* discussing the collection and receipt of sensitive health data from users of a popular women's menstruation app by Meta through its SDK, Google was contacted for comment. Google's own SDK and tracking technology also collected the same data from this popular women's menstruation app, which was later revealed following an investigation by the Federal Trade Commission.

82. But Google's conduct continued. For example, back in November 2019 the *Financial Times* uncovered that Google received prescription drug name input by users on the website drugs.com. In response to the report, Google claimed it had subsequently "marked" the data as sensitive internally, excluding it from personalized ads, but that its technology may still serve "contextual" ads from the content the user viewed.

83. Despite this, Google took no action to prevent its tracking technology from being embedded on the GoodRx Platform, from which it received health information like medical treatment and prescription information.

84. As demonstrated by the continued incorporation of Google's tracking technology on the GoodRx Platform, Google did not take any steps to prevent its interception and use of GoodRx users' sensitive health data.

85. As such, Google's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class members.

13

86. **Defendant Criteo Corp.** is a Delaware corporation with its principal place of business located in New York, New York.

87. Criteo, as the creator of its SDK and Pixel, knew that it intercepted each of a user's interactions on the website or mobile application that incorporated this technology.

88. Accordingly, Criteo at all times knew that the incorporation of its software into the GoodRx Platform would result in its interception of sensitive information, including health information relating to medical treatment and prescriptions.

89. As demonstrated by the continued incorporation of Criteo's tracking technology on the GoodRx Platform, Criteo did not take any steps to prevent its interception and use of GoodRx users' sensitive health data.

90. As such, Criteo's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class members.

## JURISDICTION AND VENUE

91. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from the Defendants.

92. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states. Plaintiffs are residents of Florida, Illinois, New York, and California whereas Defendants are Delaware entities with their principal places of business in California or New York.

93. This Court has personal jurisdiction over Google and Meta because their principal places of business are in California. Google, Meta, and Criteo are also subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including Defendants' collection and interception of Plaintiffs'

sensitive health data from the GoodRx Platform and use of that data for commercial purposes.

94.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Defendants GoodRx, Google, and Meta are headquartered in this District and subject to personal jurisdiction in this District.

95.    **Divisional Assignment**: This action arises in San Mateo County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Mateo County. Pursuant to L.R. 3-2(d), all civil actions that arise in San Mateo County shall be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

### A.    The GoodRx Platform

96.    GoodRx was founded in 2011 as a prescription coupon company. It has since expanded to provide a number of services, including telehealth and informational material about health conditions and medications.

97.    To create an account with GoodRx, users must provide their first and last name, email address, and date of birth. Users can also obtain a "GoodRx Prescription Savings Card." To receive this card users are required to provide their first and last name, address, and email. They can then use this card for discounts on prescriptions at more than 70,000 pharmacies.

15

**FIGURE 1**



98.     To search for prescription discounts, a user enters the medication name and selects a local pharmacy. They can then text, email, or print a copy of a GoodRx Coupon to use when picking up the prescription. When a user does so, GoodRx obtains a record of this purchase that includes the user's name, date of birth, and prescription information.

**FIGURE 2**



99.     GoodRx also offers telehealth services through the brand names "HeyDoctor" and "GoodRx Care." These services require a user to enter PII, including their first and last name, email address, phone number, biological sex, and current address. The user is then prompted to select the type of treatment they are seeking, such as urinary tract infection, erectile dysfunction, anxiety, depression, acne treatment, birth control, and short-term medication refills.

16

**FIGURE 3**



**UTI (Urinary Tract Infection)**

Same-day prescription to treat your UTI. Expert advice on preventing future UTIs.

Start Now

**Erectile Dysfunction**

Same-day prescription for ED medication. Discreetly delivered or pharmacy pickup.

Start Now

**Birth Control**

Same-day birth control prescriptions. Start or refill any pill, ring, or patch.

Start Now

**Anxiety, Stress, and Depression Medicine Refill**

Refill your anxiety, stress, and depression medication today. No insurance needed.

Start Now

**Acne Treatment and Prevention**

Acne is a common skin condition that causes blemishes. We provide prescription strength creams and medicines to cure and prevent it.

Start Now

**Short-Term Medicine Refill**

Get a short-term (30 or 90 day supply depending on the medicine) refill of the medicines you take regularly.

Start Now

100. Once a treatment is selected, the user is then required to either complete an online consultation and enter information about their symptoms and medication history, or schedule a visit with a provider. They must also provide payment information.

101. GoodRx also offers a paid service called "GoodRx Gold" that is paid on a monthly basis and combines its telehealth and prescription coupon services. Using this membership, GoodRx claims that users can access over 1,000 prescriptions at less than $10 and arrange visits with "licensed healthcare provider[s]" at just $19. GoodRx Gold users can also use this service to track their medication purchase history, including the medication name, purchase date, dosage, pharmacy, and prescriber.

**B.     GoodRx's Promises to Users**

102. Of course, users expect their communications with GoodRx to remain confidential. This is because this information, including health data like whether a person is experiencing a urinary tract infection or needs certain medication, is highly sensitive and private.

17

103.    Given this expectation of privacy in this type of sensitive information, it is unsurprising that GoodRx assured users this information would remain confidential.

104.    GoodRx's privacy policy reinforces this notion that users' sensitive data, including health information, would not be shared or used by third parties. For instance, between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any ***information that reveals a personal health condition or personal health information***."

105.    Between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any ***information that reveals a personal health condition or personal health information***."

106.    Between October 2017 and December 2019, GoodRx promised that it would only use "personal medical data" such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx Coupons.

107.    Between October 2017 and October 2019, it promised that when this information was shared in this limited capacity, it "ensures that these third parties are bound to comply with federal standards as to how to treat 'medical data' that is linked with your name, contact information and other personal identifiers."

108.    And in March of 2019, GoodRx promised it adheres to the Digital Advertising Alliance principles. These principles state that entities "should not collect and use . . . pharmaceutical prescriptions, or medical records about a specific individual for Online Behavioral Advertising without Consent."

109.    GoodRx's HeyDoctor privacy policy made similar promises, never disclosing or mentioning that health information would be used or shared with advertisers. Indeed, between October 2018 and July 2020, this policy told users that their information would only be shared to provide access to telehealth services and that GoodRx would obtain users' consent prior to disclosing it for any other reason. It also displayed a HIPAA seal, representing that its website

18

complied with HIPAA regulations, including the prohibition against sharing health information without written authorization from the user.

110.     GoodRx's co-CEO repeated these same sentiments on a publicly available Twitter account. On December 14, 2019, Doug Hirsch—GoodRx's co-CEO—tweeted the following:

**FIGURE 4**



111.     He repeated those sentiments in later tweets that same day, reinforcing the notion that users' sensitive data, including health information, was not shared or exploited.

**FIGURE 5**



112.     Given these representations and the types of services GoodRx provides, users like Plaintiffs and Class members expected their data, including health information, and other interactions on the GoodRx Platform, to remain confidential.

113.     Unfortunately, GoodRx's assurances were false. Despite these promises, GoodRx not only disclosed but allowed third parties to intercept highly sensitive personal and medical information that Plaintiffs and Class members entered on the GoodRx Platform, including their PII, prescriptions and other health information.

19

114.    In addition, GoodRx disclosed, and allowed third parties to intercept, unique advertising and persistent identifiers linked to individual GoodRx users in the same transmission of their prescriptions and other health information. These identifiers are a set of unique data points (typically numbers and letters), akin to a social security number, that can individually identify one specific individual across all the apps and websites they use, allowing them to be tracked overtime and across devices (e.g., smart phones, tablets, laptops, desktops, etc.). Accordingly, even for users who did not provide GoodRx with their name, GoodRx and these third parties were still able to uniquely (and easily) identify these individuals through this identifying information.

115.    GoodRx knew that it disclosed and allowed third parties to intercept its users' sensitive personal information, including health data. Indeed, it intentionally created "Custom App Events" that were sent to these third parties with obvious names, such as "Drug Name" and "Drug Category" that clearly conveyed health information. It then used this information to categorize users based on the medical condition they had or medication they used to serve targeted advertisements relating to those conditions and treatment.

116.    This information was shared with at least the Advertising and Analytics Defendants Meta, Google, and Criteo, and at least a dozen other companies.

### C.    Meta's Tracking Technology on the GoodRx Platform

117.    Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, bringing in a grand total of $114.93 billion in 2021.

118.    Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."

119.    Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 2.9 billion active users.

20

120.     Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"

121.     Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

122.     One of Meta's most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015 and its SDK.

123.     Meta touted Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."

124.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

125.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta

21

Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

126.     This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits the GoodRx Platform, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

127.     Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

128.     Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.

129.     Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.

130.     At the time Plaintiffs used the GoodRx Platform, they each maintained active social media accounts on Facebook and/or Instagram. Plaintiffs accessed the GoodRx Platform from the same devices they used to visit Facebook and/or Instagram, and Meta associated the data it collected about them from the GoodRx Platform with their Facebook and Instagram accounts and other PII.

131.     Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.

CONSOLIDATED CLASS ACTION COMPLAINT

132.     Meta's SDK collects three types of App Events. Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases." Standard Events are "popular events that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app." Custom apps events used by GoodRx often included the medication the user took in the name (i.e., "Drug Name" and "Drug Category").

133.     Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.

134.     In addition to using the data intercepted through Meta Pixel and the SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

135.     Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

136.     According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . and it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"

137.     In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

138.     Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question.

139.     GoodRx uses at least the Meta Pixel on the GoodRx Platform. As a result, GoodRx disclosed and Meta intercepted users' interactions on the GoodRx Platform. Meta received at least "Custom Events" named by GoodRx and URLs that disclosed the name of the medication, the health condition relating to that medication, the medication quantity, pharmacy name, and the user's city, state, zip code, and IP address. Meta also received additional PII, including name, email address, address, phone number, and gender. Meta and GoodRx used this data, as well as other data uploaded directly to Meta by GoodRx, so that GoodRx could run advertisements using its services.

140.     Plaintiffs provided their PII, health information, and other sensitive data to GoodRx to obtain medical treatment and prescriptions. This information was disclosed to and intercepted by Meta.

141.     Plaintiffs did not consent to the interception or disclosure of their data to Meta. GoodRx's disclosure, and Meta's interception, of Plaintiffs' PII, health data, and other highly sensitive information without their consent is an invasion of privacy and violates several laws, including the Confidentiality of Medical Information Act ("CMIA") and California Invasion of Privacy Act ("CIPA").

**D.      Google's Tracking Technology on the GoodRx Platform**

142.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

143.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and

24

brand advertising."[1] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|-----------|-------------|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

144. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

145. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

146. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

---

[1] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

147.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

148.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

149.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[2] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[3]

150.    Google Analytics is incorporated into third-party websites and apps by adding a small piece of JavaScript measurement code to each page on the site. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects identifiable information, such as the IP address and Client ID.

151.    Once the code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics also allows the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

152.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition

---

[2] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[3] *Id.*

(e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

153.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

154.    GoodRx uses Google's pixel and SDK on the GoodRx Platform. As a result, GoodRx disclosed and Google intercepted users' interactions on the GoodRx Platform. Google received at least "Custom Events" named by GoodRx and URLs that disclosed the name of the medication, drug type, the health condition relating to that medication, the medication quantity and dosage, and pharmacy ID. Google also received additional PII, including phone number, email address, zip code, IP address, as well as unique advertising IDs and device IDs that uniquely identify the user and their device.

155.    Each of the Plaintiffs provided their PII, health information, and other sensitive data to GoodRx to obtain medical treatment and prescriptions. This information was disclosed to and intercepted by Google.

156.    Plaintiffs did not consent to the interception or disclosure of their data to Google. GoodRx's disclosure, and Google's interception, of Plaintiffs' PII, health data, and other highly sensitive information without their consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**E.    Criteo's Tracking Technology on the GoodRx Platform**

157.    Criteo is a digital advertising company that focuses on serving personalized advertisements. In 2021, Criteo earned $2.2 billion in revenue.

27

158.     Criteo offers data collection and advertising technology to other companies. For instance, Criteo offers the "Criteo One Tag" which is a snippet of code similar to the Meta Pixel.

159.     Using the Criteo One Tag, or by uploading data separately, companies like GoodRx can utilize Criteo's advertising platform to target specific users. For instance, Criteo offers "audiences" that group users based on a specific data point or similarity between them.

160.     GoodRx uses Criteo's tracking technology, such as an SDK or pixel, on the GoodRx Platform. As a result, GoodRx disclosed and Criteo intercepted users' interactions on the GoodRx Platform. Criteo received at least users' health information, including what GoodRx Coupons they accessed or used.

161.     Plaintiffs provided their PII, health information, and other sensitive data to GoodRx to obtain medical treatment and prescriptions. This information was disclosed to and intercepted by Criteo.

162.     Plaintiffs did not consent to the interception or disclosure of their data to Criteo. GoodRx's disclosure, and Criteo's interception, of Plaintiffs' PII, health data, and other highly sensitive information without their consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**F.     Other Tracking Technologies on the GoodRx Platform**

163.     GoodRx incorporated a host of other third parties' tracking technologies on the GoodRx Platform, each of which permitted GoodRx to disclose, and third parties to intercept, Plaintiffs' and Class members' PII, health data, and other highly sensitive information.

164.     For instance, as of 2020, it was estimated GoodRx incorporated tracking technology from approximately *twenty* third parties.

165.     One of these companies is marketing firm Braze, who received users' drug names, the pharmacies from which they sought to fill their prescription, and unique IDs (described above, *see* ¶ 114) that advertising and analytics companies use to uniquely identify a user and their device across the internet.

28

166.    Other companies whose technology GoodRx incorporated on its platform include Branch Metric, which is a software company focused on deep linking and attribution, and Twilio, which provides a host of services including analytics.

167.    Every time GoodRx disclosed users' PII, health data, and other sensitive information to a third party through the technology incorporated in the GoodRx Platform, and those third parties intercepted users' data, constitutes a separate invasion of Plaintiffs' and Class members' privacy and violation of the law.

**G.    Plaintiffs and Class Members Do Not Consent to Defendants' Conduct**

168.    Plaintiffs and Class members had no way of knowing that GoodRx was disclosing, and the Advertising and Analytics Defendants were intercepting, their communications when interacting with the GoodRx Platform, because their software is inconspicuously incorporated in the background.

169.    This conduct is all the more egregious given the nature of the information entered into the GoodRx Platform, e.g., PII, requests for prescriptions, and identifiable medical information, among other things. Plaintiffs and Class members would not expect this information would be disclosed or intercepted without their consent.

170.    This is especially true given GoodRx's consistent representations that this information would remain private and confidential. For instance, between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any *information that reveals a personal health condition or personal health information*." Accordingly, Plaintiffs and Class members did not consent to Defendants' conduct.

**H.    Plaintiffs and Class Members have a Reasonable Expectation of Privacy in their User Data**

171.    Plaintiffs and Class members have a reasonable expectation of privacy in their communications on the GoodRx Platform, including their health information.

CONSOLIDATED CLASS ACTION COMPLAINT

172.     Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

173.     For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

174.     Users act consistent with these preferences.  Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

175.     Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.

176.     Other privacy law experts have expressed concerns about the disclosure to third parties of a users' intimate health data.  For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you're charged on loans, and leave you vulnerable to workplace discrimination.

177.     Defendants' surreptitious disclosure and interception of Plaintiffs' and Class members' private communications, including PII, health information, and other sensitive data violates Plaintiffs' and Class members' privacy interests.

CONSOLIDATED CLASS ACTION COMPLAINT

## I.    Defendants Used GoodRx Users' Data

178.    The data GoodRx disclosed and the Advertising and Analytics Defendants intercepted is also extremely valuable. According to Experian, health data is a "gold mine" for healthcare companies and clinicians.

179.    Consumers' health data, including what prescriptions they have, are extremely profitable. For instance, Datarade.ai advertises access to U.S. customers names, addresses, email addresses, telephone numbers who bought brand name medicine. The starting price for access to just some of this data was $10,000. Other companies, like Pfizer, spend $12 million annually to purchase health data and the medical data industry itself was valued at over $2.6 billion back in 2014.

180.    Defendant GoodRx monetized and used the data collected from GoodRx users to serve personalized advertisements. For example, GoodRx used (and paid) Meta to serve advertisements based on users' prescription medication.

181.    Specifically, using Meta's "Ads Manager" and "Custom Audiences" feature, GoodRx identified users with Facebook and Instagram accounts, and also uploaded data directly to Meta, including users' email addresses, phone numbers, and mobile identifiers (e.g., device IDs and advertising IDs) to identify users.

182.    GoodRx then categorized users based on their health information (e.g., users who had used a certain prescription) it disclosed and allowed Meta to intercept and use this information to create Custom Audiences. It named these Custom Audiences based on the medication these users had been prescribed (e.g., "atorvastatin claims" to mark atorvastatin prescription users). It then used these Custom Audiences to serve personalized ads, including those related to their medical treatment and prescription information.

183.    GoodRx ran these targeted advertising campaigns on Instagram and Facebook between 2017 and 2020.

31

184.   For instance, between August 2017 and March 2018, GoodRx served targeted advertisements based on users who viewed drug pages for Losartan, Amlodipine, Zolpidem, Topiramate, and Quetiapine, respectively.

185.   Between November 1, 2018 and February 29, 2019, GoodRx targeted users who visited HeyDoctor's webpages for sexually transmitted diseases.

186.   Between July 22 and August 4, 2019, GoodRx targeted users who viewed GoodRx Coupons for Lipitor, Lisinopril, Neurontin, Prednisone, and Zithromax. The ads featured those prescriptions.

187.   In August 2019 GoodRx ran a campaign using Meta's services based on users who had purchased prescriptions for Lisinopril, Azithromycin, Atorvastatin, or Prednisone. Each of these users were grouped into a Custom Audience based on which of these prescriptions they used, titled "lisinopril claims" "atorvastatin claims" "azith claims" and "pred claims."

188.   Between November 1 and December 6, 2019, GoodRx targeted users who visited HeyDoctor's webpages for erectile dysfunction with advertisements promoting prescriptions for this condition.

189.   Between January 9, 2020 and February 25, 2020, GoodRx targeted users who had viewed GoodRx Coupons for Cialis or Sildenafil.

190.   In January 2020, GoodRx targeted users who viewed GoodRx Coupons for birth control, and in February 2020 it targeted users who accessed GoodRx Coupons for Cialis or Sildenafil with advertisements for Viagra.

191.   The above list, while not exhaustive, details the extreme abuses by GoodRx and Advertising and Analytics Defendants of Plaintiffs' sensitive data.

**J.     The Federal Trade Commission Action Against GoodRx**

192.   On February 1, 2023, the Federal Trade Commission ("FTC") filed an action against Defendant GoodRx alleging it violated the FTC Act and the FTC's Health Breach Notification Rule. *United States v. GoodRX Holdings, Inc.*, No. 3:23-cv-00460-DMR (N.D. Cal.).

32

193.     The FTC alleged that GoodRx disclosed its users' PII, as well as details about their medications and sensitive health conditions, to Defendants Facebook, Google, Criteo, as well as other third parties like Branch Metrics and Twilio. Specifically, the FTC's complaint alleged that, since 2017, GoodRx has "repeatedly violated" its promises not to disclose its users' personal information – except for in limited circumstances – by "sharing sensitive user information with third-party advertising companies and platforms . . . ." FTC Complaint ¶ 3-4.

194.     According to the FTC, GoodRx shared the following type of information without providing notice to or seeking consent from its users: prescription medications and personal health conditions, personal contact information, and unique advertising and persistent identifiers.  *Id.* ¶ 4.

195.     The FTC complaint alleges that it "permitted third parties that received users' personal health information to use and profit from the information for their own business purposes." *Id.* GoodRx allegedly targeted users on Facebook and Instagram with advertisements that were premised upon their personal health information. *Id.* ¶ 5.

196.     The FTC resolved the allegations against GoodRx on February 22, 2023. The stipulated order required GoodRx to pay civil penalties, as well as take certain corrective actions to prevent the disclosure of additional users' PII and health information, including ceasing the use of health information for advertising purposes and further misrepresenting its disclosure of health information.

197.     Following this settlement, GoodRx notified users via email and through a "2023 Notice" posted on its website of its settlement with the FTC.

198.     In this notice, GoodRx admitted it shared identifiable information about its users, including "details about drug and health conditions people searched and their prescription medications." GoodRx stated it "shared this information with third parties, including Facebook" and "[i]n some cases . . . used the information to target people with health-related ads."

199.    GoodRx asserts that it intends to "put in place a comprehensive privacy program with heightened procedures and controls to protect [users'] personal and health information" and that it will "never share [users'] health information with . . . third parties."

200.    These measures should have been adopted in the first instance and do nothing for the millions of users whose data GoodRx already disclosed and used (along with the remaining Defendants) for advertising and analytics.

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

201.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

202.    Defendant GoodRx secretly incorporated the Advertising and Analytics Defendants' software into the GoodRx Platform, providing no indication to users that they were interacting with sites that shared their data, including PII and health data, with third parties.

203.    Defendants had exclusive knowledge that the GoodRx Platform incorporated the Advertising and Analytics Defendants' software, yet failed to disclose that fact to users, or that by interacting with the GoodRx Platform Plaintiffs' and Class members' sensitive data, including PII and health data, would be disclosed to and intercepted by third parties.

204.    Plaintiffs and Class members could not with due diligence have discovered the full scope of Defendants' conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that GoodRx was disclosing, and third parties were intercepting, data from the GoodRx Platform.

205.    The earliest Plaintiffs and Class members could have known about Defendants' conduct was upon the filing of the FTC Complaint.

206.    Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so.  Defendants are therefore estopped from relying on any statute of limitations under the discovery rule.

207.    Additionally, Defendants engaged in fraudulent conduct to prevent Plaintiffs and Class members from discovering the disclosure and interception of their data. GoodRx misled Plaintiffs and Class members to believe their data, including health data and PII, would not be disclosed or intercepted.

208.    GoodRx represented to Plaintiffs and Class members that it complied with HIPAA. It also promised Plaintiffs and Class members that their data would not be disclosed or used for advertising.

209.    Plaintiffs and Class members were not aware that Defendants disclosed and intercepted their data, including PII and health information.

210.    Plaintiffs and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendants' misconduct by virtue of their fraudulent concealment.

211.    Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## **PUBLIC INJUNCTIVE RELIEF**

212.    Plaintiffs seek an injunction on behalf of themselves, the putative class of similarly situated California residents, and the general public, prohibiting GoodRx from unlawfully sharing GoodRx users' communications and/or data with third parties, including the Advertising and Analytics Defendants, and from omitting material representations regarding its data sharing practices from unsuspecting subscribers.

213.    Plaintiffs also seek a public injunction requiring GoodRx to notify all subscribers and members of the general public about its data sharing activities with the Advertising and Analytics Defendants, particularly that GoodRx has not maintained the confidentiality and privacy of the communications and data of its users, and instead shared that data with third parties, including the Advertising and Analytics Defendants.

35

214. Additionally, Plaintiffs seek an injunction requiring GoodRx to permanently delete any analytics, advertisements, or other data sets it created and/or benefited from as a result of improperly sending GoodRx users' communications and/or data to third parties.

215. Lastly, Plaintiffs seek an injunction against the Advertising and Analytics Defendants, requiring them to immediately cease the use of GoodRx users' data improperly obtained through their tracking technology and to permanently delete this data from all servers in all forms.

216. The public injunctive relief sought is essential to eradicating Defendants' continuing deceptive conduct about the privacy of users' sensitive information. In the absence of an injunction, Defendants will remain free to continue to mislead members of the public regarding the privacy and security of the personal information they have—or will—share[d] with GoodRx, causing members of the public to believe GoodRx's representations in its privacy policy that GoodRx "never provide[s] advertisers or any other third parties any information that reveals a personal health condition or personal health information."

217. GoodRx promises to adhere to the Digital Advertising Alliance principles, and its HeyDoctor privacy policy promises that users' information would only be shared to provide access to telehealth services and that GoodRx would obtain users' consent prior to disclosing it for any other reason. GoodRx's CEO further publicly announced on Twitter that GoodRx does not "sell information" and that all information provided to GoodRx is "stored under the same guidelines as any health entity." GoodRx does not disclose to the unknowing public that, contrary to these statements, it shares and allows interception of this sensitive information by the Advertising and Analytics Defendants. Members of the public have a right to know that GoodRx discloses and allows third parties to intercept highly sensitive personal and medical information that users enter on the GoodRx Platform, including their PII, prescriptions and other health information.

218. The public injunctive relief sought will protect the public from Defendants' deceitful practices which misrepresent and omit material facts about GoodRx's data sharing and privacy

36

policies and violate the privacy rights of GoodRx users. Plaintiffs reserve the right to request additional injunctive relief and/or modify this request based on discovery.

## CLASS ACTION ALLEGATIONS

219.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

**Nationwide Class:** All natural persons in the United States who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

In addition, or in the alternative, Plaintiffs plead the following State Classes:

**California Class:** All natural persons in the State of California who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

**Florida Class:** All natural persons in the State of Florida who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

**Illinois Class:** All natural persons in the State of Illinois who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

**New York Class:** All natural persons in the State of New York who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

**New Jersey Class:** All natural persons in the State of New Jersey who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

220.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

37

221. **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals, and the members can be identified through GoodRx's records.

222. **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

- Whether Defendants violated Plaintiffs' and Class members' privacy rights;

- Whether Defendants' acts and practices violated the Common Law Invasion of Privacy;

- Whether Defendants were unjustly enriched;

- Whether Defendants' acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

- Whether Defendants' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

- Whether Plaintiffs and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and

- Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

223. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class. The claims of Plaintiffs and the members of the Class arise from the same conduct by Defendants and are based on the same legal theories.

224. **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendants have no defenses unique to any Plaintiff. Plaintiffs and their counsel are committed to vigorously

38

1  prosecuting this action on behalf of the members of the Class, and they have the resources to do so.

2  Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members

3  of the Class.

4     225.   **Substantial Benefits:** This class action is appropriate for certification because class

5  proceedings are superior to other available methods for the fair and efficient adjudication of this

6  controversy and joinder of all members of the Class is impracticable.  This proposed class action

7  presents fewer management difficulties than individual litigation, and provides the benefits of single

8  adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment

9  will create economies of time, effort, and expense and promote uniform decision-making.

10    226.   Plaintiffs reserve the right to revise the foregoing class allegations and definitions

11  based on facts learned and legal developments following additional investigation, discovery, or

12  otherwise.

13              **CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

14    227.   California substantive laws apply to every member of the Class. California's

15  substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under

16  the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the

17  U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the

18  claims asserted by Plaintiffs and Class members, thereby creating state interests to ensure that the

19  choice of California state law is not arbitrary or unfair.

20    228.   GoodRx, Meta, and Google maintain their principal places of business in California

21  and conduct substantial business in California, such that California has an interest in regulating

22  GoodRx, Meta, and Google's conduct under its laws. Google and Meta also each selected California

23  law as the law to govern all disputes with their customers in their respective terms of service.

24  Defendants GoodRx, Meta, and Google's decision to reside in California and avail themselves of

25  California's laws, renders the application of California law to the claims herein constitutionally

26  permissible.

27

28

39

229.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes, and California has a greater interest in applying its laws here given Defendants' locations and the location of the conduct at issue than any other interested state.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion
(On Behalf of Plaintiffs and the Class)
(Against all Defendants)

230.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

231.     A plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

232.     GoodRx's disclosure of Plaintiffs' and Class members' sensitive data, including PII, health information, prescription requests and other interactions on the GoodRx Platform, to third parties like the Advertising and Analytics Defendants constitutes an intentional intrusion upon Plaintiffs' and Class members' solitude or seclusion.

233.     Plaintiffs and Class members had a reasonable expectation of privacy in the health information and other personal data that GoodRx disclosed to third parties. Plaintiffs' health information, prescription requests, and other interactions with the GoodRx Platform are inherently sensitive in nature. Plaintiffs and Class members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

234.     This expectation is especially heightened given GoodRx's consistent representations to users that this information would be safeguarded and not disclosed to third parties like Meta, Google, and Criteo.

235.     GoodRx promised that it would only use personal medical data such as prescription

drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx Coupons.

236.    Indeed, in March of 2019, GoodRx promised it adheres to the Digital Advertising Alliance principles. These principles state that entities "should not collect and use . . . pharmaceutical prescriptions, or medical records about a specific individual for Online Behavioral Advertising without Consent."

237.    And its co-CEO publicly made similar statements, tweeting "People can use GoodRx without giving us any information. Any information we do receive is stored under the ***same guidelines as any health entity***."

238.    Given these representations, and the nature of the data GoodRx received, Plaintiffs and Class members had a reasonable expectation of privacy in their data relating to their use of the GoodRx Platform and expected this information would not be disclosed.

239.    Plaintiffs and Class members did not consent to, authorize, or know about GoodRx's intrusion at the time it occurred. Accordingly, Plaintiffs and Class members never agreed that GoodRx could disclose their data to third parties.

240.    The surreptitious disclosure of sensitive data, including PII and health information from millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

241.    The offensiveness of this conduct is all the more apparent because GoodRx's disclosure of this information was conducted in secret in a manner that Plaintiffs and Class members would be unable to detect through the incorporation of highly technical SDKs and pixels that was contrary to the actual representations made by GoodRx.

242.    As a result of GoodRx's actions, Plaintiffs and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

41

243.     Plaintiffs and Class members have been damaged as a direct and proximate result of GoodRx's invasion of their privacy and are entitled to just compensation, including monetary damages.

244.     Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as well as a disgorgement of profits made by GoodRx as a result of its intrusions upon Plaintiffs' and Class members' privacy.

245.     Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of GoodRx's actions, directed at injuring Plaintiffs and Class members in conscious disregard of their rights.  Such damages are needed to deter Defendants from engaging in such conduct in the future.

246.     Plaintiffs also seek such other relief as the Court may deem just and proper.

### SECOND CLAIM FOR RELIEF
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion
(On Behalf of Plaintiffs and the Class)
(Against Advertising and Analytics Defendants)**

247.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

248.     Plaintiffs asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

249.     Advertising and Analytics Defendants' surreptitious interception, storage, and use of Plaintiffs' and Class members' interactions and communications with the GoodRx Platform, including PII, health information, and prescription requests, constitutes an intentional intrusion upon Plaintiffs' and Class members' solitude or seclusion.

42

250.     Plaintiffs and Class members expected this information to remain private and confidential given the nature of the GoodRx Platform, which is primarily used to receive medical advice, treatment, prescriptions, and prescription coupons.

251.     This expectation is especially heightened given GoodRx's consistent representations that this data would remain confidential. Plaintiffs and Class members did not expect third parties, and specifically Advertising and Analytics Defendants, to secretly intercept this information and their communications.

252.     Plaintiffs and Class members did not consent to, authorize, or know about Advertising and Analytics Defendants' intrusion at the time it occurred. Plaintiffs and Class members never agreed that Advertising and Analytics Defendants could intercept, store, and use this data.

253.     Defendants' intentional intrusion on Plaintiffs' and Class members' solitude or seclusion would be highly offensive to a reasonable person. Plaintiffs and Class members reasonably expected, based on GoodRx's repeated assurances, that their information would not be disclosed to or collected by any third parties, including to Advertising and Analytics Defendants.

254.     The surreptitious taking and interception of sensitive data, including PII and medical information from millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

255.     The offensiveness of this conduct is all the more apparent because Advertising and Analytics Defendants' interception, storage, and use of this information was conducted inconspicuously in a manner that Plaintiffs and Class members would be unable to detect and was contrary to the actual representations made by GoodRx.

CONSOLIDATED CLASS ACTION COMPLAINT

256. Given the highly sensitive nature of the data that Advertising and Analytics Defendants intercepted, such as private details about medications and health information, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

257. As a result of Advertising and Analytics Defendants' actions, Plaintiffs and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

258. Plaintiffs and Class members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

259. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiffs' and Class members' privacy.

260. Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

261. Plaintiffs also seek such other relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**
**(Against All Defendants)**

262. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

263. Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

264. Defendants received benefits from Plaintiffs and Class members in the form of the Plaintiffs' highly valuable data, including health information and PII, that Defendants wrongfully

44

disclosed and intercepted from Plaintiffs and Class members without authorization and proper compensation.

265.     Defendants disclosed, intercepted, stored, and used this data for their own gain, providing Defendants with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

266.     Had Plaintiffs known of Defendants' misconduct, they would not have provided any of their data to Defendants or have used or paid to use the GoodRx Platform.

267.     Defendant GoodRx also unjustly benefitted from payments Plaintiffs Jane Doe, Jane Doe II, and Wilson made to use GoodRx's services, which they otherwise would not have made had they known of Defendants' misconduct.

268.     Defendants unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

269.     The benefits that GoodRx derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

270.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Violation of California Confidentiality of Medical Information Act ("CMIA")**
**Civil Code Section 56.06**
**(On Behalf of Plaintiffs and the Class)**
**(Against GoodRx)**

271.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

45

272.     GoodRx is a provider of healthcare under Cal. Civ. Code Section 56.06, subdivisions (a) and (b), because the GoodRx Platform maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a heath care provider, or for the diagnoses, treatment, or management of a medical condition.

273.     GoodRx is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

274.     The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." As explained above, the information GoodRx maintained and disclosed is medical information because it is identifiable information relating to patient's medical histories, conditions, treatments, and prescriptions.

275.     GoodRx violated Cal. Civ. Code Section 56.06(e) because it did not maintain the confidentiality of users' medical information. GoodRx disclosed to third parties Plaintiffs' and Class members' medical information without consent, including information concerning medications they were taking or were prescribed.

276.     GoodRx shared this identifiable information with third parties, including Meta, Google, and Criteo and whose primary business includes selling advertisements, analytics, or other insights based on the data they obtain about individuals, and using such data to improve their products, services, and algorithms.

277.     GoodRx knowingly and willfully disclosed medical information without consent to Advertising and Analytics Defendants for financial gain.  Namely, to sell more products, advertise, obtain analytics, and improve the GoodRx Platform, in violation of Cal. Civ. Code Section 56.06(e). GoodRx's conduct was knowing and willful as they were aware that Advertising and Analytics

46

Defendants would obtain all user data input while using their sites, yet intentionally embedded Advertising and Analytics Defendants' code anyway.

278.     At the very least, GoodRx negligently disclosed medical information to Advertising and Analytics Defendants in violation of Cal. Civ. Code Section 56.06(e).

279.     Accordingly, Plaintiffs and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

### FIFTH CLAIM FOR RELIEF
#### Violation of CMIA
#### Civil Code Section 56.101
#### (On Behalf of Plaintiffs and the Class)
#### (Against GoodRx)

280.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

281.     Cal. Civ. Code Section 56.101 (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

282.     Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36[.]"

283.     GoodRx is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information.

284.     GoodRx failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Advertising and Analytics Defendants, Plaintiffs' and Class members' medical information, including information concerning medications they were taking or were prescribed.

47

285. GoodRx's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Cal. Civ. Code Section 56.101 (a).

286. Accordingly, Plaintiffs and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SIXTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Civil Code Section 56.10**
**(On Behalf of Plaintiffs and the Class)**
**(Against GoodRx)**

287. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

288. Cal. Civ. Code Section 56.10 (a) prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

289. GoodRx disclosed medical information without first obtaining authorization when it disclosed to third parties Advertising and Analytics Defendants Plaintiffs' and Class members' data, including PII and prescription requests. No statutory exception applies.

290. GoodRx knowingly and willfully disclosed medical information without consent to Advertising and Analytics Defendants for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise its services, in violation of Cal. Civ. Code Section 56.10, subdivision (a).

291. At the very least, GoodRx negligently disclosed medical information in violation of Cal. Civ. Code Section 56.10, subdivision (a) through the unauthorized disclosure of Plaintiffs' and Class members' sensitive medical information.

292. Accordingly, Plaintiffs and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory

damages pursuant to Cal. Civ. Code Section 56.35; and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violation of CMIA**
**Civil Code Section 56.06, 56.101, 56.10**
**(On Behalf of Plaintiffs and the Class)**
**(Against Advertising and Analytics Defendants)**

293.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

294.    As set forth herein, GoodRx's disclosure of Plaintiffs' and Class members' medical information violates the CMIA.

295.    By contracting with GoodRx to receive and use Plaintiffs' and Class members' data and communications, including medical information, as well as providing the means to accomplish this objective, Advertising and Analytics Defendants acted intentionally or alternatively, with knowledge that GoodRx's misappropriation of Plaintiffs' and Class members' medical information was a violation of the CMIA.

296.    Advertising and Analytics Defendants provided substantial assistance and encouragement to GoodRx's violation of the CMIA, including by providing the means, i.e., SDKs and pixels, to share and disclose this data. Advertising and Analytics Defendants knew that their software could be seamlessly integrated without alerting users that their sensitive medical information would be shared with Advertising and Analytics Defendants.

297.    Advertising and Analytics Defendants' agreements with GoodRx and receipt of Plaintiffs' and Class members' sensitive information, including medical information, is a substantial factor in causing the violations of the CMIA alleged herein. For example, in the absence of Advertising and Analytics Defendants' technology, GoodRx would likely not have shared Plaintiffs' and Class members' medical information.

298.    Given the lucrative value of Plaintiffs' and Class members' medical information, Advertising and Analytics Defendants were willing to receive, and encouraged, GoodRx to share this data. As a result, Advertising and Analytics Defendants aided and abetted GoodRx's CMIA

49

violations and are therefore jointly liable with GoodRx for the relief sought by Plaintiffs and the Class.

**EIGHTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Civil Code Section 56.36**
**(On Behalf of Plaintiffs and the Class)**
**(Against Advertising and Analytics Defendants)**

299.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

300.    Cal. Civ. Code Section 56.36(B)(3)(A) prohibits any person of entity other than a licensed health care professional from knowingly or willfully obtaining medical information for financial gain.

301.    Cal. Civ. Code Section 56.36(B)(5) prohibits any person or entity who is not permitted to receive medical information under the CMIA from knowingly and willfully obtaining, disclosing, or using the medical information without written authorization.

302.    The Advertising and Analytics Defendants are entities who are not licensed health care professionals, and Advertising and Analytics Defendants are not permitted to receive medical information under the CMIA.

303.    The Advertising and Analytics Defendants violated Cal. Civ. Code Sections 56.36(B)(3)(A) and (B)(5) because they knowingly and willfully obtained medical information from the GoodRx Platform without authorization for their own financial gain.

304.    As described herein, the Advertising and Analytics Defendants intentionally designed their software to intercept data from the websites and mobile applications in which they are incorporated.

305.    The Advertising and Analytics Defendants knew this software was incorporated on websites and mobile applications that would consequently lead to the interception of medical information, including medical information input in the GoodRx Platform.

306.    The Advertising and Analytics Defendants knowingly and willfully received this information without written authorization from Plaintiffs and Class members, and did so for their

50

own financial gain. Namely, to profit through advertising and analytics services they offer, as well as to improve their algorithms, data points, and other technologies.

307. Pursuant to Cal. Civ. Code Section 56.36(B)(3)(A) and Cal. Civ. Code Section 56.36(B)(5), the Advertising and Analytics Defendants are liable for a civil penalty up to $250,000 per violation of these sections.

**NINTH CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the Class and Subclass)**
**(Against All Defendants)**

308. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

309. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

310. Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

51

311.    Defendants are persons for purposes of § 631.

312.    Defendants GoodRx, Meta, and Google maintain their principal places of business in California, where they designed, contrived, agreed, conspired, effectuated, and/or received the interception and use of the contents of Plaintiffs' and Class members' communications. Additionally, Google and Meta have adopted California substantive law to govern their relationship with users.

313.    The Advertising and Analytics Defendants' technology (i.e., SDKs and pixels), Plaintiffs' and Class members' browsers and mobile applications, and Plaintiffs' and Class members' computing and mobile devices are a "machine, instrument, contrivance, or . . . other manner."

314.    At all relevant times, the Advertising and Analytics Defendants, through their SDKs and pixels, intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiffs and Class members and GoodRx's website and app without the consent of all parties to the communication.

315.    The Advertising and Analytics Defendants, willfully and without the consent of Plaintiffs and Class members, read or attempt to read, or learn the contents or meaning of Plaintiffs' and Class members' communications to GoodRx while the communications are in transit or passing over any wire, line or cable, or were being received at any place within California when it intercepted Plaintiffs' and Class members' communications and data with GoodRx, which is headquartered in California, in real time.

316.    The Advertising and Analytics Defendants used or attempted to use the communications and information they received through their tracking technology, including to supply analytics and advertising services.

317.    By incorporating the Advertising and Analytics Defendants' technology on its website, GoodRx aided, agreed with, employed, and conspired with Advertising and Analytics Defendants to carry out the wrongful conduct alleged herein.

318.    The interception of Plaintiffs' and Class members' communications was without authorization and consent from the Plaintiffs and Class members. Accordingly, the interception was unlawful and tortious.

319.    Plaintiffs and the Class members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

320.    Plaintiffs and Class members have also suffered irreparable injury from these unauthorized acts.  Plaintiffs' and Class members' sensitive data has been disclosed, viewed, stored, and used by Advertising and Analytics Defendants, have not been destroyed, and due to the continuing threat of such injury, Plaintiffs and Class members have no adequate remedy at law and are entitled to injunctive relief.

**TENTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiffs and the Class and Subclass)**
**(Against Advertising and Analytics Defendants)**

321.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

322.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication". .

323.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

324.    Plaintiffs' and Class members' communications to GoodRx, including their sensitive medical information including information concerning medications they were taking or were prescribed, their medical histories, allergies, and answers to other health-related questions, were

CONSOLIDATED CLASS ACTION COMPLAINT

confidential communications for purposes of § 632, because Plaintiffs and Class members had an objectively reasonable expectation of privacy in this data.

325. Plaintiffs and Class members expected their communications to GoodRx to be confined to GoodRx in part, because of GoodRx's consistent representations that these communications would remain confidential. Plaintiffs and Class members did not expect third parties, and specifically Advertising and Analytics Defendants, to secretly eavesdrop upon or record this information and their communications.

326. The Advertising and Analytics Defendants' tracking technology, i.e., SDKs and pixels, are all electronic amplifying or recording devices for purposes of § 632.

327. By contemporaneously intercepting and recording Plaintiffs' and Class members' confidential communications to GoodRx through this technology, Advertising and Analytics Defendants eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

328. At no time did Plaintiffs or Class members consent to the Advertising and Analytics Defendants' conduct, nor could they reasonably expect that their communications to GoodRx would be overheard or recorded by Advertising and Analytics Defendants.

329. The Advertising and Analytics Defendants utilized Plaintiffs' and Class members' sensitive medical information for their own purposes, including advertising and analytics.

330. Plaintiffs and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

331. Plaintiffs and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and Class members' sensitive data has been collected, viewed, accessed, stored, by Advertising and Analytics Defendants, have not been destroyed, and due to the

continuing threat of such injury, have no adequate remedy at law, Plaintiffs and Class members are entitled to injunctive relief.

## ELEVENTH CLAIM FOR RELIEF
### Violation of the California Consumers Legal Remedies Act ("CLRA")
### Cal. Civ. Code §§ 1750, *et seq*
### (On Behalf of Plaintiffs Jane Doe, Jane Doe II, and Wilson and the Class)
### (Against GoodRx)

332. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

333. Plaintiffs Jane Doe, Jane Doe II, and Wilson bring this claim on behalf of themselves and on behalf of the Class.

334. GoodRx engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiffs and the Class members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

335. For instance, GoodRx made representations that it would protect Plaintiffs' privacy interest, including promising that it would "never provide advertisers or any other third parties any *information that reveals a personal health condition or personal health information*."

336. GoodRx promised that it would only use "personal medical data" such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx coupons.

337. It also represented in public tweets and by displaying the HIPAA seal that it complied with HIPAA, which prohibits the disclosure of data for advertising and analytics without written authorization from the user.

338. GoodRx made these representations with no intention of living up to these representations. Contrary to these representations, GoodRx disclosed and allowed third parties to intercept Good Rx users' sensitive data, including health data and PII.

339. Further, GoodRx failed to disclose it secretly shared, used, and allowed third parties to intercept Plaintiffs' and Class members' sensitive data, including PII and health information.

340.    GoodRx was under a duty to disclose this information given its relationship with GoodRx users and its exclusive knowledge of its misconduct (e.g., the technology incorporated on the GoodRx Platform, the data is disclosed and allowed third parties to intercept through this technology, and how it and third parties used this data).

341.    Plaintiffs and Class members would not have purchased, or would have paid significantly less for, GoodRx services and products had GoodRx not made these false representations. GoodRx profited directly from these sales, including through payment for these services and products, and from the data disclosed and intercepted.

342.    Plaintiffs, individually and on behalf of the Class, seeks an injunction requiring GoodRx to obtain consent prior to disclosing and otherwise using Plaintiffs' and Class members' sensitive personal data and to delete the data already collected, and any other relief which the court deems proper.

343.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs served GoodRx with notice of its alleged violations of the CLRA by certified mail return receipt requested contemporaneously with the filing of this complaint. GoodRx failed to provide appropriate relief for its violations of the CLRA within 30 days. Accordingly, Plaintiffs seek monetary damages under the CLRA.

344.    In accordance with Cal. Civ. Code § 1780(d), Plaintiffs' CLRA venue declarations are attached hereto as Exhibit A.

## TWELFTH CLAIM FOR RELIEF
### Violations of Cal. Bus. & Prof. Code §§ 17200 *et. seq.*
### (On Behalf of Plaintiffs and the Class)
### (Against All Defendants)

345.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

346.    Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.* ("UCL"), because, as alleged above, Defendants violated the California common law and other statutes and causes of action described herein.

56

347.    Defendants' business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendants violated this public policy by, among other things, disclosing and intercepting Plaintiffs' and Class members' sensitive data, including PII and health data, without consent.

348.    GoodRx further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties, which deceived and misled users of the GoodRx Platform.

349.    Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Defendants secretly disclosing, intercepting, and misusing Plaintiffs' and Class members' sensitive personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs and Class members were completely unaware of Defendants' conduct, they could not have possibly avoided the harm.

350.    Defendants' business acts and practices are also "fraudulent" within the meaning of the UCL. Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted, a large collection of sensitive personal data, including health information and PII, without disclosing this practice and therefore acted without users' knowledge or consent. Defendants' business acts and practices were likely to, and did, deceive members of the public including Plaintiffs and Class members into believing this data was private and would not be shared with third parties.

351.    GoodRx assured users that it "never provide[s] advertisers or any other third parties any *information that reveals a personal health condition or personal health information*."

352.    GoodRx did not disclose that it would share this data with third parties, including with Advertising and Analytics Defendants.

353.    Such information was not kept private, as GoodRx disclosed and allowed the Advertising and Analytics Defendants to intercept this data.

354. Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

355. Had Plaintiffs and Class members known their personal information, including health data and PII, would be disclosed and intercepted, they would not have used or purchased, or would have paid significantly less for, GoodRx services and products.

356. Plaintiffs and Class members have a property interest in their sensitive personal data. By surreptitiously disclosing and intercepting Plaintiffs' and Class members' information, Defendants have taken property from Plaintiffs and Class members without providing just or any compensation.

357. Health data, including prescription information, objectively has value. Companies are willing to pay for this data, including the disclosed to and intercepted by Advertising and Analytics Defendants. For instance, Pfizer annually pays approximately $12 million to purchase health data from various sources.

358. This data also objectively has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[4]

359. By unlawfully disclosing and intercepting this data, Defendants have taken money or property from Plaintiffs and Class members.

360. For these reasons, Plaintiffs seeks at least restitution and other equitable relief on behalf of herself and Class members as a result of Defendants' violations of the UCL.

---

[4] Andrea Park, *How much should health data cost? $100K or more, according to patients*, BECKER'S HOSP. REV. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

## THIRTEENTH CLAIM FOR RELIEF
### Violation Of New York General Business Law § 349
### (Pleaded in the Alternative, on Behalf of Plaintiff E.C. and the New York Class)
### (Against All Defendants)

361.    Plaintiff E.C. pleads this claim in the alternative individually and on behalf of the New York Class.

362.    Plaintiff re-alleges and incorporates by reference all of the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

363.    Defendants are considered "businesses" under New York General Business Law 349 ("GBL § 349").

364.    Defendants' business acts and practices are unfair and deceptive under GBL § 349. New York (as well as other states through their respective unfair and deceptive trade practices statutes) has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data.  Defendants violated GBL § 349 by, among other things, disclosing and intercepting Plaintiffs' and Class members' sensitive data, including Private Information, without consent.

365.    GoodRx further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties, which deceived and misled users of the GoodRx Platform.

366.    Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.  The gravity of the harm of Defendants secretly disclosing, intercepting, and misusing Plaintiffs' and Class members' sensitive and highly valuable personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiff and Class members were completely unaware of Defendants' conduct, they could not have possibly avoided the harm.

367.    By unlawfully disclosing and intercepting this data, Defendants have taken money or property from Plaintiff and Class members. Plaintiff and Class members seek all available

damages under applicable state consumer protection laws, including statutory damages under GBL § 349.

## FOURTEENTH CLAIM FOR RELIEF

### Violation Of The Illinois Consumer Fraud And Deceptive Business Practices Act
### 815 Ill. Comp. Stat. Ann. § 505/1, *et seq.*
### (Pleaded in the Alternative, on Behalf of Plaintiff John Doe and the Illinois Class)
### (Against All Defendants)

368. Plaintiff John Doe pleads this claim in the alternative individually and on behalf of the Illinois Class.

369. The Illinois Consumer Fraud and Deceptive Business Practices Act was created to protect Illinois consumers from deceptive and unfair business practices.

370. Defendants' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, in trade or commerce in Illinois, with the intention that Plaintiffs and Illinois Subclass members would rely on such conduct, making it unlawful under 815 Ill. Comp. Stat. Ann. §505/1, *et seq.*

371. Plaintiff John Doe and Illinois Subclass members relied on the material representations made by Defendants and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 815 Ill. Comp. Stat. Ann. §505/1, *et seq.*

372. Plaintiffs and Illinois Subclass members acted as reasonable consumers would have acted under the circumstances, and Defendants' unlawful conduct would cause reasonable persons to enter into the transactions that resulted in the damages.

373. Accordingly, pursuant to 815 Ill. Comp. Stat. Ann. §505/1, *et seq.*, Plaintiffs and Illinois Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. In addition, given the nature of Defendants' conduct, Plaintiffs and Illinois Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the

60

amount of time reasonably expended and equitable relief necessary or proper to protect them from Defendants' unlawful conduct.

### FIFTEENTH CLAIM FOR RELIEF
**Negligence *Per Se***
**(Pled in the Alternative, on Behalf of all Plaintiffs and Classes)**
**(Against GoodRx)**

374.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein. This claim is pled in the alternative to all other counts.

375.    While GoodRx's conduct was by all means intentional, it was at the very least (and in the alternative) negligent.

376.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" as interpreted and enforced by the FTC. Various FTC publications and orders also form the basis of GoodRx's duty.

377.    The Health Breach Notification Rule (the "Rule" or the "HBNR"), 16 C.F.R. § 318, requires that any "vendor of personal health records" and related entities notify individuals when the security of their individually identifiable health information has been breached. *See* 16 C.F.R. § 318(a)(1). The notice "shall be sent without unreasonable delay and in no case later than 60 calendar days after the discovery of a breach of security." 16 C.F.R. § 318.4(a).

378.    GoodRx had a duty to comply with Section 5 of the FTC Act.

379.    GoodRx breached that duty when it violated Section 5 of the FTC Act by engaging in unfair practices with respect to its handling of Plaintiffs' personal health information, as described herein.

380.    GoodRx also had a duty to notify individuals when the security of their individually identifiable health information has been breached pursuant to the HBNR.

381.    GoodRx breached that duty when it violated the HBNR by failing to provide timely and accurate notice to Plaintiffs and class members of the extent to which it had shared their data with third parties.

382.     Plaintiffs and class members are consumers within the class of persons Section 5 of the FTC Act and the HBNR were intended to protect.

383.     GoodRx's violation of Section 5 of the FTC Act and HBNR constitutes negligence *per se*.

384.     The harm that has occurred as a result of GoodRx's conduct is the type of harm that the FTC Act and HBNR were intended to guard against.

385.     But for GoodRx's wrongful breach of its duties owed to Plaintiffs and Class members, Plaintiff and Class members would not have been injured, or would not have been injured to as great a degree.

386.     The injury suffered by Plaintiffs and Class members was a reasonably foreseeable result of GoodRx's breach of its duties. GoodRx knew or should have known that the breach of its duties would cause Plaintiff and Class members to suffer the foreseeable harms associated with the improper disclosure of their sensitive information, including health data.

387.     As a direct and proximate result of GoodRx's negligence, Plaintiffs and class members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial, and injunctive relief.

## SIXTEENTH CLAIM FOR RELIEF
### Common Law Negligence
### (Pleaded in the Alternative, on Behalf of all Plaintiffs and the California, New York, Florida and Illinois Classes)
### (Against GoodRx)

388.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein. This claim is pled in the alternative to all other counts.

389.     While GoodRx's conduct was by all means intentional, it was at the very least (and in the alternative) negligent.

390.     GoodRx is a provider of telehealth and prescription coupon services whose users, including Plaintiffs and Class members, entrust it with highly sensitive personal data, including health information and PII in connection with these services.

391.     Given the highly sensitive nature of the personal data, including health information and PII, and likelihood of harm resulting from its unauthorized disclosure, multiple statutes, regulations, and guidelines, in addition to the common law, impose a duty on GoodRx to protect this information.

392.     GoodRx owed a duty of care to Plaintiffs and Class members to exercise reasonable care to protect their information consistent with the various statutory requirements, regulations, guidelines, and common law.

393.     GoodRx's duty of care arose as a result of, among other things, the special relationship that existed between GoodRx and its users. GoodRx was the only party in a position to ensure that it was sufficiently protecting Plaintiffs' and Class members' sensitive personal data, including health information and PII from unauthorized disclosure to third parties, including the Advertising and Analytics Defendants.

394.     GoodRx breached its duty to exercise reasonable care in protecting Plaintiffs' and Class members' sensitive personal data, including health information and PII, when it disclosed this data without authorization to third parties, including the Advertising and Analytics Defendants.

395.     It was foreseeable to GoodRx that the unauthorized disclosure of Plaintiffs' and Class members' sensitive personal data, including health information and PII could result in injury to its users.

396.     As a direct and proximate result of GoodRx's negligence, Plaintiffs and class members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

CONSOLIDATED CLASS ACTION COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class respectfully requests that the Court enter an order:

A.  Certifying the Class and appointing Plaintiffs as the Class's representatives;

B.  Finding that Defendants' conduct was unlawful, as alleged herein;

C.  Awarding declaratory relief against Defendants;

D.  Awarding such injunctive and other equitable relief as the Court deems just and proper, including public injunctive relief as described herein;

E.  Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.  Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

G.  Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

H.  Granting such other relief as the Court deems just and proper.


Dated: May 26, 2023

*s/ Christian Levis*

Christian Levis (admitted *pro hac vice*)
Amanda Fiorilla (admitted *pro hac vice*)
Rachel Kesten (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

*Attorneys for Plaintiff Jane Doe, Plaintiff Jane Doe II*
*& Proposed Co-Lead Counsel*

64

L. Timothy Fisher (SBN 191626)
Jenna L. Gavenman (SBN 348510)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
E-mail: jgavenman@bursor.com

*Attorneys for Plaintiff Marquez & Proposed Co-Lead Counsel*

Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
ascubert@sjk.law

*Attorneys for Plaintiff Jane Doe & Proposed Liaison Counsel*

Mark L. Javitch (CA SBN 323729)
mark@javitchlawoffice.com
**JAVITCH LAW OFFICE**
3 East 3rd Ave., Suite 200

San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705

Thomas A. Zimmerman, Jr. (admitted *pro hac vice)*
tom@attorneyzim.com
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180

*Attorneys for Plaintiff John Doe & Proposed Executive Committee Member*

Israel David (admitted *pro hac vice)*

65

israel.david@davidllc.com
Blake Hunter Yagman (admitted *pro hac vice*)
blake.yagman@davidllc.com
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Telephone: (212) 739-0622
Facsimile: (212) 739-0628

*Attorneys for Plaintiff E.C. & Proposed Executive Committee Member*

Rebecca M. Hoberg
rhoberg@moyalawfirm.com
**MOYA LAW FIRM**
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 926-6521

*Local Counsel for Plaintiff E.C.*

Jonathan Shub (CA SBN237708)
Benjamin F. Johns
Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
(610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Plaintiff Wilson & Proposed Executive Committee Member*

66